IN THE DISTRICT COURT OF GUAM

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL CASE NO. 22-00019 |
| | ) | |
| Plaintiff, | ) | ORDER DENYING MOTION TO |
| | ) | SUPPRESS FILED BY DEFENDANT |
| vs. | ) | RAYMOND JOHN MARTINEZ, JR., |
| | ) | AND DEFENDANT JUANITA MARIE |
| RAYMOND JOHN MARTINEZ, JR.; | ) | QUITUGUA MOSER MARTINEZ'S |
| and JUANITA MARIE QUITUGUA | ) | ACCOMPANYING JOINDER; |
| MOSER MARTINEZ, | ) | |
| | ) | ORDER DENYING REQUEST FOR |
| Defendants. | ) | EVIDENTIARY HEARING |
| | ) | |
| _____ | ) | |

**ORDER DENYING MOTION TO SUPPRESS FILED BY DEFENDANT RAYMOND JOHN MARTINEZ, JR., AND DEFENDANT JUANITA MARIE QUITUGUA MOSER MARTINEZ'S ACCOMPANYING JOINDER; ORDER DENYING REQUEST FOR EVIDENTIARY HEARING**

**I.      INTRODUCTION.**

On April 29, 2024, Defendant Raymond John Martinez, Jr. ("Martinez"), filed a Motion to Suppress wiretap evidence. *See* Doc. Nos. 104 (sealed version)/128 (redacted version). On May 6, 2024, Defendant Juanita Marie Quitugua Moser Martinez ("Moser") joined in the motion. *See* Doc. No. 108. The court denies the Motion to Suppress and the joinder. The court also denies the request for an evidentiary hearing. *See* Doc. No. 108.

**II.      NECESSITY REQUIREMENT FOR WIRETAPS.**

The motion seeks to suppress evidence obtained through a wiretap, arguing that the wiretap application was wrongfully granted. Under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, an application for a wiretap must include "a full and complete statement as to whether or not other

investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). "A law enforcement officer typically includes this statement of facts in a sworn affidavit in support of the wiretap application." *United States v. Rodriguez*, 851 F.3d 931, 937 (9th Cir. 2017). Additionally, a judge may not authorize a wiretap unless the facts submitted by the applicant show that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). When read together, these sections require a full and complete statement that establishes the "necessity" for the wiretap. *Rodriguez*, 851 F.3d at 937. This "ensures that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001); *see also United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974). These procedural mandates require "strict adherence," with courts applying "utmost scrutiny" to determine if wiretap orders comply with the law. *Blackmon*, 273 F.3d at 1207.

"The wiretap statute also includes its own exclusionary rule, requiring suppression of wiretap evidence that the government obtains in violation of Title III." *Rodriguez*, 851 F.3d at 937; 18 U.S.C. § 2515 ("Whenever any wire or oral

2

communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.").

A wiretap application must be supported by a "full and complete statement of specific allegations indicating why normal investigative procedures failed or would fail in the particular case." *Blackmon*, 273 F.3d at 1207. A showing of necessity must go beyond a generic claim such as a mere statement that drug conspiracies are difficult to investigate. An affidavit must "show with specificity why in *this particular investigation* ordinary means of investigation will fail." *United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir. 1985) (quoting *United States v. Robinson*, 698 F.2d 448, 453 (D.C. Cir. 1983)). The government, however, "need not exhaust every conceivable alternative before obtaining a wiretap." *United States v. McGuire*, 307 F.3d 1192, 1197 (9th Cir.2002).

A court reviewing a wiretap order applies a "common sense approach" that uses "a standard of reasonableness to evaluate the government's good faith effort to use alternative

3

investigative means or its failure to do so because of danger or low probability of success." *Id.*; *accord United States v. Christie*, 825 F.3d 1048, 1068 (9th Cir. 2016). While boilerplate conclusions describing inherent limitations of normal investigative techniques are insufficient to justify a wiretap, "minor deficiencies in detail will not doom an affidavit." *Christie*, 825 F.3d at 1068. A court should examine the level of detail in the whole affidavit, rather than piecemeal instances throughout it. *Id.*

## III.     NO EVIDENTIARY HEARING IS REQUIRED UNDER THE CIRCUMSTANCES.

The Supreme Court has held:

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

*Franks v. Delaware*, 438 U.S. 154, 155–56 (1978).

The Court explained:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting

4

> reasons. Affidavits or sworn or otherwise
> reliable statements of witnesses should be
> furnished, or their absence satisfactorily
> explained. Allegations of negligence or
> innocent mistake are insufficient.

*Id.* at 171. Thus, to be entitled to an evidentiary hearing pursuant to *Franks*, "the defendant must make a substantial showing that the government intentionally or recklessly omitted or falsified information and that such information was material to a finding of probable cause or necessity." *See United States v. Staves*, 383 F.3d 977, 983 (9th Cir. 2004). In other words, a *Franks* hearing is required upon a showing that a "wiretap application contain[s] false statements or material omissions." *United States v. Lococo*, 514 F.3d 860, 864 (9th Cir. 2008).

In requesting an evidentiary hearing, Martinez seeks to cross-examine a government agent about boilerplate language taken from case law used in two paragraphs of the agent's affidavit. *See* ECF No. 108. While the affidavit contains two paragraphs of boilerplate language, the bulk of it consists of facts relevant to the specific investigation in issue. No false statement or material omission has been averred. Accordingly, no evidentiary hearing is necessary. *See United States v. Shryock*, 342 F.3d 948, 977 (9th Cir. 2003) (holding that no evidentiary hearing is required when a defendant fails to show that an affidavit contains a false statement that was (1) deliberately or

5

recklessly included in support of a wiretap, and (2) material to the finding of necessity).

IV.      **BACKGROUND.**

        **A.   Methamphetamine Trials of Martinez and Moser.**

        On June 10, 2015, Martinez and Moser were indicted in the United States District Court for Guam.  The indictment charged them with methamphetamine violations, and with having conspired to commit money laundering.  The indictment also sought forfeitures.  *See United States v. Martinez*, *et al*, Crim. No. 15-00031, Doc. No. 1.  Ultimately a Second Superseding Indictment charged Martinez and Moser with conspiracy to distribute methamphetamine, possession with intent to distribute methamphetamine hydrochloride, and conspiracy to commit money laundering, and also sought forfeitures.  *See id.*, Doc. No. 223. On June 2, 1017, the district court severed the drug charges in Counts 1 and 2 from the money laundering charges in Counts 3 and 4, then ordered that Martinez and Moser be tried on the drug charges first.  *See id.*, Doc. No. 261.  The first jury trial began on February 21, 2018, and ended on May 24, 2018 with a hung jury.  *See id.*, Doc. Nos. 393 and 496.  A second trial began on October 11, 2018, and ended on November 18, 2018, with another hung jury.  *See id.*, Doc. Nos. 548 and 588.  It appears that Martinez and Moser were not in custody during the second drug

6

trial.  *See* Doc. 543 (Minutes of Pretrial Conference stating, "Defendants released as previously ordered").

### B. October 29, 2018, Application for a Wiretap on a Phone Used by John T. Mantanona.

On October 29, 2018, during the second trial, the Government applied for a wiretap of cellular telephone number (671) 727-8558 (international mobile subscriber identity number 310110671023059) ("Target Telephone"), subscribed to by two individuals, including John T. Mantanona, concerning distribution of methamphetamine and conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846.  John Mantanona, Audrey Wolford (aka "Redd"), and another individual who has not been publicly identified were the "Target Subjects" believed to have been committing drug crimes.  The application identified distribution of methamphetamine and conspiracy to distribute methamphetamine as the "Target Offenses" for the wiretap.  However, the application also noted that Mantanona's alleged prior involvement in jury tampering in Saipan and in witness interference might suggest that the wiretap would also capture evidence of such violations in the second drug trial of Martinez and Moser, occurring at the time.  *Id.*, Page 58 of 82.  The wiretap application pertained to methamphetamine crimes distinct from the methamphetamine crimes charged in the second drug trial of Martinez and Moser.

7

In support of the wiretap application with respect to the Target Telephone, the Government submitted an affidavit of FBI Special Agent Patrick J. Ernst. *See* ECF No. 130-1 (redacted version of affidavit viewable by public). Ernst indicated that text messages obtained via a search warrant and recorded conversations between confidential informants (who consented to having the conversations recorded) and John Mantanona and Wolford indicated that Mantanona was using the Target Telephone. *Id.*, Page 4 of 82. Ernst described John Mantanona as a private investigator who had previously worked for the Guam Police Department and who had been a task force officer for the FBI and the DEA.

According to Ernst, a member of the Guam Police Department Criminal Investigations Division was supplying Mantanona with sensitive law enforcement information and allowing him to participate in official police matters. Ernst described Wolford as the former girlfriend of Vincent Raymond Rios, a convicted drug trafficker. Ernst said that Wolford was paying Mantanona for protection from law enforcement. *Id.*, Pages 8-10 of 82. Ernst identified Eric Aponik as a leader of a methamphetamine distribution organization on Guam whose multiple associates included Vincent Rios and Wolford. *Id.*, Page 15 of 82.

8

Rios was arrested when he went to the post office to pick up a package containing approximately 18 pounds of methamphetamine. He entered a plea of guilty to drug and money laundering charges. He told DEA agents that he had paid Mantanona $30,000 for information as to whether he was going to be investigated by law enforcement. Rios said that at one point when he was pulled over by Guam police he had $250,000 and about 600 grams of methamphetamine in his car. He called Mantanona on that occasion and had him speak with the officer who had pulled him over. After the call, the officer allowed Rios to leave. Rios said he paid Mantanona $5,000 for his help with that traffic stop. Rios also paid Mantanona $5,000 for helping him with an issue with his driver's license, and another $5,000 for other information. According to Rios, he gave Mantanona an additional $30,000 to pay off Mantanona's Lexus, then confirmed that Manatonona was driving a 2015 Lexus. *Id.*, Pages 15-16 of 82.

The Government obtained 10 search warrants with respect to Wolford's telephone numbers, including (671) 788-1903. On May 4, 2014, Wolford received a text message at that number asking whether she had any left. Wolford responded that she did not but was going to "re up," which Ernst concluded meant she was going to replenish her supply. *Id.*, Pages 17-18 of 82.

Pursuant to a search warrant, the Government obtained text messages from the Target Telephone to another phone number,

9

(617) 482-3274, belonging to an officer with the Guam Police Department.  Those messages indicated that, from 2016, the officer was providing Mantanona with police information, such as vehicle registrations, cases, upcoming executions of search warrants, and information about people who were later arrested. *Id.*, Pages 41-47 of 82.  The Government obtained pen registers for the Target Telephone, determining that between October 1, 2017, and August 27, 2018, and between September 25, 2018, and October 24, 2018, there were 599 phone calls and 142 text messages between the Target Telephone and (617) 482-3274.  *Id.*, Page 49 of 82.  There were also 10 calls to a Guam Police Department office number, 50 calls to the Guam Police Department dispatcher, and 22 calls to the Guam Department of Corrections switchboard.  *Id.*, Page 50 of 82.  There were 201 calls and 83 text messages between the Target Telephone and Wolford's number. *Id.*, Pages 50-51 of 82.

On June 1, 2017, Mantanona (using the Target Telephone) and Wolford (using (671) 788-1903)) had a text message exchange discussing inmates at a Guam jail.  Mantanona wrote, "Did they call u they promise i can protect them no more if i didnt get anything u know what is going to happen."  Ernst read this as saying that Mantanona was telling Wolford that he would not protect inmates who did not pay him.  Mantanona also wrote, "ok but have him no mention on the phone be careful cus they are

watching them." According to Ernst, Mantanona was advising inmates that their calls were being recorded. *Id.*, Pages 19-20 of 82.

On July 21, 2017, Wolford (using (671) 788-1903)) messaged Manatona, who was using the Target Telephone: "Just wondering why baubata patrolling my area." Mantanona responds, "Dont worry u r smarter." Ernst viewed this exchange as indicating that Wolford was concerned about Guam Police Officer Benny Baubata, who routinely arrested drug traffickers, and that in Mantanona's opinion, Wolford's knowledge of how to evade law enforcement was sufficient to evade Baubata. *Id.*, Page 21 of 82.

On November 20, 2017, pursuant to a search warrant, officers discovered 18 grams of methamphetamine in a package that had been mailed. Wolford picked the package up and opened it at her home. Officers then searched her home pursuant to a different search warrant and discovered a digital scale, baggies, and other drug paraphernalia, as well as a list of names with the following written next to them: "being watched," "arrested," "taken down," and "under surveillance." *Id.*, Pages 21-22 of 82.

Ernst's descriptions of drug trafficking activities were based in part on confidential informants. Confidential informant #1 ("CS1") had a 2012 plea agreement with respect to drug trafficking and had cooperated with law enforcement thereafter. CS1 agreed to record telephone and in-person

conversations with Rios, Wolford, Eric Aponik, and Mantanona, then cooperated with respect to the prosecution of Rios and others. *Id.*, Pages 11-12 of 82.

Confidential informant #2 ("CS2") provided information to the Government with respect to Wolford's and Mantanona's drug trafficking activities. CS2, who had previously entered into a plea agreement relating to charges of having conspired to distribute methamphetamine, being a felon in possession of a firearm and ammunition, and having engaged in monetary transactions with proceeds of unlawful activity, also agreed to record telephonic and in-person conversations with Wolford and Mantanona. *Id.*, Page 12 of 82.

On February 1, 2018, CS2 recorded a phone call between CS2 and Mantanona, who was using the Target Telephone. In that call, CS2 told Mantanona that Redd (an alias used by Wolford) had told CS2 to call Mantanona. Mantanona asked CS2 if CS2 planned to hire him. CS2 was looking for the same level of protection as another person and asked whether "they are looking into me already." Mantanona told CS2, "No," then added that he would call CS2 right away if he heard CS2's name. *Id.*, Pages 22-23 of 82. CS2 said CS2 had "stuff waiting" for CS2 in California and that Wolford had said that "you have the protection." CS2 wanted help from Mantanona "[t]o make sure . . . that if anything out there's going to happen, that [CS'2 is] going to have the heads

12

up." *Id.*, Page 25 of 82. Mantanona warned CS2 that Wolford was
being watched and that "twice they hit her." *Id.*, Page 26 of 82.

CS2 agreed to record a phone conversation between CS2
and Wolford on February 8, 2018. In that call, CS2 asked Wolford
whether her uncle could help CS2 out and ensure protection.
Wolford responded, "He'll give you heads up over all the raids
are going to happen. He'll give you a head's up if anything - if
they're -if they're shut down . . . how long." *Id.*, Page 27 of
82. CS2 noted that Mantanona was a retired cop who still had
someone on the inside so knew what was going to happen. *Id.*,
Pages 28-29 of 82. Wolford told CS2 that she had had a head's up
about an upcoming raid and that, when she asked Mantanona to
"disregard that," he asked her to give him someone else to raid.
She told Mantanona "Mark Mayo," and police then conducted a
search warrant and arrested Mark Mayo for drug crimes. *Id.*,
Pages 29-30 of 82. Wolford told CS2 that she had to pay "at
least seven percent" and that she had paid almost fifteen
thousand.

On February 16, 2018, CS2 participated in a controlled
purchase of 5 grams of methamphetamine from Wolford for $1,250.
*Id.*, Page 31 of 82.

On April 25, 2018, CS2 agreed to record a phone call
between CS2 and Mantanona. In that call, CS2 asked whether
Mantanona had someone at the airport to help CS2 bring something

into Guam. Mantanona suggested that they meet in person at a golf course, telling CS2 to "Make sure you get some okay." Ernst said that "get some" meant to bring money.

On April 27, 2018, CS2 and Mantanona met at the golf course. CS2 recorded the meeting. CS2 told Mantanona that CS2 was hoping that Mantanona had someone at the airport that could help him. Mantanona said that, even if one controlled the line at the airport, DEA or some other task force might be watching. *Id.*, Pages 33-34 of 82. Mantanona later told CS2 the name of a person that Mantanona said had snitched on CS2. *Id.*, Pages 34-35 of 82.

On May 3, 2018, CS2 participated in another controlled purchase of 5 grams of methamphetamine from Wolford for $1,000. *Id.*, Page 35 of 82.

On May 22, 2018, CS2 recorded a phone call between CS2 and Mantanona on the Target Telephone. In that call, CS2 told Mantanona that CS2 was going to the post office to "pick it up" and asked whether there was any way he could make sure "there's nobody there." Mantanona told CS2 that "they're busy" on the other side of the island. He told CS2 to call him and that he would follow CS2. Ernst indicated that this conversation meant that CS2 had a drug shipment coming in and wanted Mantanona to make sure no law enforcement was at the post office. According to Ernst, Mantanona was telling CS2 that it was okay to pick up

14

the package because police were busy on the other side of the island and that CS2 should call him so that he could follow CS2 to make sure law enforcement was not following CS2. *Id.*, Pages 36-38 of 82. Later that day, CS2 called Mantanona on the Target Telephone, telling him that CS2 had not picked up the package because a blue Mazda SUV pulled up behind CS2 in the post office parking lot and the driver stared at CS2. CS2 asked Mantanona if Mantanona could run the Mazda's plates. Mantanona said he could but that he knew law enforcement did not use blue Mazda SUVs. Mantanona told CS2 that he had a guy who could pick up the package but "won't talk." *Id.*, Pages 38-39 of 82.

Confidential informant #3 ("CS3") also provided information to the Government with respect to Wolford's drug trafficking activities. CS3 was identified through materials obtained via a search warrant. CS3 told agents that Wolford's boyfriend was Rios, that Wolford sold methamphetamine to CS3 every other week from June 2016 until February or March 2017, that CS3 contacted Wolford to schedule drug buys by calling (671) 788-1904, and that Wolford lived near San Vincent School, where CS3 would go to pick up the drugs. *Id.*, Pages 13-14, 17 of 82.

Relying on the information given to him, Ernst believed that Mantanona was being paid to provide sensitive law enforcement information to drug dealers to help them avoid law enforcement. Ernst asked for the wiretap to obtain evidence of

15

drug trafficking activity, including: discovering the identities and roles of all drug traffickers hiring Mantanona to help them avoid prosecution; discovering which law enforcement personnel provided Matanona with sensitive law enforcement information; discovering how methamphetamine was being smuggled into Guam; and discovering stash locations.

Ernst indicated that the wiretap was necessary because "normal investigative techniques have been tried and have failed to fully achieve the goals of this investigations, or appear reasonably unlikely to succeed if tried, or are too dangerous to be tried." *Id.*, Page 52 of 82. For example, Ernst noted that confidential sources normally had limited information. In this case, while confidential sources provided information and evidence of Mantanona's protection of drug dealers in return for money, the sources were unable to get Mantanona to tell them who his source in the police department was. *Id.*, Pages 59-60 of 82.

Similarly, Ernst said that, while controlled purchases of drugs showed that Rios, Aponik, and Wolford were drug trafficking, controlled purchases did not show how the drugs were smuggled into Guam or where they were stored. Nor did the controlled purchases show all the drug traffickers who had hired Mantanona for protection from law enforcement or who Mantanona's sources of sensitive police information were. *Id.*, Pages 61 of

16

82. Pen registers and trap and trace devices suffered from the same limitations. *Id.*, Pages 73-74 of 82.

Physical surveillance, according to Ernst, rarely succeeded in gathering evidence of criminal activities. Rather, physical surveillance confirmed meetings and criminal activity between participants. Ernst said that Mantanona had tutored drug dealers in avoiding law enforcement and spotting surveillance. For example, Ernst recounted how Wolford had spotted law enforcement and then, after calling the Target Telephone, went up and asked why she was being followed. Ernst noted that, given Guam's small and protective neighborhoods, physical surveillance was difficult, with neighbors informing others of the presence of law enforcement. When Ernst was conducting surveillance of Mantanona, a neighbor approached his vehicle, told him he could not park there, and wrote down his vehicle's license number. On another day, after he drove by Mantatona's house, loud whistles followed Ernst as he drove away, which he thought was some form of neighborhood alarm. *Id.*, Page 62-65 of 82.

Ernst did not think the use of undercover agents would be feasible in investigating Wolford's drug trafficking or Mantanona's protection services. While an undercover agent could conduct controlled buys, the confidential sources and consensual recordings had already accomplished that. Given the limited information an undercover agent could supply, Ernst did not

17

believe that such use would further the investigation and might only put an undercover agent in danger. *Id.*, Page 66 of 82.

Law enforcement had executed over a dozen search warrants, but search warrants, according to Ernst, were unlikely to produce information with respect to Mantanona's sources in the police department. *Id.*, Page 67-68 of 82.

Ernst indicated that interviews and grand jury subpoenas might alert criminals to investigations. He did not think any grand jury investigation would be fruitful because people like Mantanona would likely invoke their Fifth Amendment rights and would likely lie unless confronted with facts forcing them to tell the truth. He did not think immunity was appropriate, because it might insulate the most culpable people. *Id.*, Pages 69-70 of 82.

Nor did Ernst think trash searches would yield much. Wolford was seen placing her trash in her vehicle's trunk and driving off with it. Given the protective nature of the neighborhoods, Ernst thought it would be difficult to obtain trash without triggering a neighbor's warning to Mantanona. Ernst thought trash searches would be unlikely to result in the identification of Mantanona's police source(s). *Id.*, Page 70-71 of 82.

Ernst said law enforcement had used a pole camera that did not have sound to see who Wolford was meeting with, but he

18

did not think the pole camera would lead to information regarding Mantanona's sources. Similarly, Ernst did not think a "mail cover" capturing what mail was sent to and from Mantanona would provide information about Mantanona's criminal activity, as there was no evidence indicating that Mantanona conducted that activity by mail. *Id.*, Pages 73-74 of 82.

Ernst did not think that financial records, which might show deposits and expenditures, would lead to information about Mantanona's sources or the identities of drug traffickers. He noted that drug traffickers typically dealt in cash, as shown by cash payments Mantanona received from Rios and Woldford, although Mantanona withdrew more than $41,000 in three transactions in 2017. *Id.*, Pages 74-75 of 82.

On October 29, 2018, United States District Judge Leslie E. Kobayashi of the District of Hawaii signed an order allowing the interception of communications to and from the Target Telephone concerning the Target Offenses (distribution of methamphetamine and conspiracy to distribute methamphetamine) and the Target Subjects, who included Mantanona and Wolford, as requested by the October 29, 2018, wiretap application. *See* Misc. Case. No. 18-00439 LEK/RLP, ECF No. 2 (sealed).

C. **November 28, 2018, Application.**

On November 28, 2018, the Government sought a renewed wiretap on the Target Telephone. The affidavit in support of

19

that second application was also signed by Ernst.  It contained
the same information as Ernst's October 2018 affidavit but also
added to it.  Specifically, it sought to authorize a wiretap on
the Target Telephone used by Mantanona to gain information about
drug trafficking and Mantanona's sources of sensitive police
information.  It added as targets Martinez, Moser, and Gregory
Tyquiengco.  The earlier wiretap had uncovered evidence of
Mantanona's alleged tampering with the second Martinez/Moser drug
trial, as well as of knowledge by Martinez and Moser of that
tampering.  Specifically, it uncovered evidence that Tyquiengco,
a juror on that trial, was in contact with Mantanona with respect
to returning a "not guilty" verdict.  *See* Doc. 130-2, Pages 3-4
of 102.  Ernst said that Martinez and Moser hired Mantanona as a
private investigator and that the three of them conspired to
influence Tyquiengco to vote "not guilty."  *Id.*, Page 12 of 102.

> 1. **Recorded Conversations Showing Mantanona Providing Protection and Advice for Drug Dealers.**

Pursuant to the first wiretap authorization on the
Target Telephone, law enforcement recorded a call on
November 5, 2018, between Mantanona and Wolford.  Wolford asked
Mantanona if the fee for protection was still the same.
Mantanona replied that the fee was the same, but with everything
going on, the more she gave him the better.  Later in the same

20

conversation, Wolford stated, "by listening to you, I don't carry money, I don't carry dope." *Id.*, Pages 21-23 of 102.

Mantanona warned Wolford not to trust Eric Aponik. *Id.*, Page 25 of 102. Mantanona told Wolford to call him as soon as she got "it," which Ernst believed referred to the protection payment. Mantanona then said to use a code and text him that she had a flat or simply type in a star. Woldford said she would use a star and a dollar sign, but Mantanona said not to use the dollar sign. Instead, he told her to text a star and a heart. Mantanona said he would respond with "MC," meaning meet behind Mangilao Church, where his brother-in-law lived. *Id.*, Pages 28-30 of 102. During the call, Mantanona told Wolford not to trust a certain person who was going to be taken down in December. He stated that the person bought a house and that that left a paper trail for the Government to follow and seek forfeiture. He recommended hiding money. *Id.*, Pages 30-31 of 102. Mantanona asked if Ben Rios, who was in prison, still had money on the outside. Wolford said that Rios had told her during a visit that he still had $2 million and 20 pounds on the outside. *Id.*, Page 34 of 102.

Pursuant to the first wiretap authorization on the Target Telephone, law enforcement recorded a call on November 12, 2018, between Mantanona and Wolford. Wolford told Mantanona that Eric Aponik's "one is happening" and that Aponik was asking

whether he should pay Mantanona. Wolford told Mantanona that Aponik wanted Mantanona to stake out the post office to see if there were any officers there. Wolford was the one making the pick up. *Id.*, Page 37 of 102. On November 19, 2018, Wolford called Mantanona, wanting to be sure that the coast was clear. Mantanona responded, "Good so far." *Id.*, Page 40 of 102. A little after 5 p.m. on November 19, 2018, Wolford was apprehended at the post office trying to pick up a package containing fake methamphetamine. *Id.*, Page 41 of 102. She was later released and called Mantanona, telling him that federal agents had taken her down at the post office. She told him that the agents had let her go without charging her because she had denied involvement with drugs and had not opened the package. Mantanona responded that the agents had not had enough to charge her. *Id.*, Pages 42-43 of 102.

Law enforcement then recorded a call on November 23, 2018, between Mantanona and Wolford. Mantanona asked if "one" was coming. He then told Wolford, "they are doing a round up. . . December." *Id.*, Page 46 of 102.

### 2. Mantanona's Juror Tampering.

Ernst says that, pursuant to the first wiretap authorization on the Target Telephone, law enforcement recorded a call on November 1, 2018, between Mantanona and Moser. This call

22

occurred during the second Martinez/Moser drug trial.[1]  Mantanona appeared to say that he had told people to come to the jury trial on Monday for an hour just to be seen by the jury.  Moser asked, "Do they come during the government's parts or do they wait until our part and then come."  Mantanona responded that he told them to come at 9 a.m.  Doc. 130-2, Page 52 of 102.

Mantanona told Moser that there was a juror in her trial who was like family.  This juror, identified by Ernst as Tyquiengco, saw Mantanona's brother at a funeral.  Mantanona said that his brother then called Mantanona to say that "he's going to help you one hundred percent."  The juror said he did not raise his hand to speak up during jury selection because he wanted to help Mantanona out.  The juror was told to seek to be the foreperson or at least to vote "NG."  Mantanona therefore told Moser, "we can do the mistrial okay?  That's it.  Done.  Hundred percent."  *Id.*, Pages 53-55 of 102.

On November 2, 2018, the Government recorded a call between Mantanona and a person identified as "William."

---

[1] Pursuant to Rule 201(b)(2) and (c)(1) of the Federal Rules of Evidence, this court takes judicial notice of the dates of the second Martinez/Moser drug trial, as those dates are adjudicative facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  According to the docket for the case, the second drug trial began on October 11, 2018.  *See id.*, Doc. No. 548.  On November 13, 2018, the second jury was discharged after indicating that it could not reach a verdict on the drug charges, and a second mistrial declared.  *See United States v. Martinez, et al*, Crim. No. 15-00031, Doc. No. 588.

Mantanona asked "William" to contact "Greg." "Greg" is Tyquiengco's first name. The requested call was to arrange a meeting so Mantanona could ask something and give something, *Id.*, Pages 57-58 of 102. A few days later, on November 5, 2018, the Government recorded a call in which Mantanona asked "William" to contact "Greg" to remind him to help Mantanona. Mantanona told "William" that "Greg" had already indicated that he was going to support Mantanona. Mantanona indicated that as long as "Greg" voted "not guilty," they would get a new trial. Mantanona hoped that "Greg" would become the boss of the jury and convince everyone to vote "not guilty." "William" told Mantanona not to worry because Greg did whatever he said he was going to do. *Id.*, Pages 59-61 of 102.

On November 7, 2018, while conducting surveillance of Mantanona, law enforcement saw him meet with a juror who had been disqualified from the second Martinez/Moser drug trial. This former juror, Bradley Dickson, got into a vehicle driven by Mantanona. A couple of days later, on November 9, 2018, the Government recorded a call between Mantanona (using the Target Telephone) and Dickson. In that conversation, Mantanona told Dickson that he wanted him to "put down" that in week two of the trial a woman on the jury, Ms. Cruz, had fallen asleep and that, when Dickson woke her up, she told him that she did not have to listen to the testimony because she had already decided that both

24

defendants were guilty.  Mantanona explained that he was trying to refresh Dickson's memory because what Dickson had said did not make sense.  He told Dickson not to say that Mantanona forced him to do anything.  Mantanona also told Dickson to complain that he was discriminated against as white when he was removed from the jury.  *Id.*, Pages 61-69 of 102.  A declaration by Dickson was filed on November 12, 2018.[2]  *See id.*, Page 73 of 102.

On November 13, 2018, Martinez thanked Mantanona.  This was after a mistrial was declared in the second drug trial.  Martinez then said, "let's not talk about it on the phone."  Martinez said that he knew Mantanona did not want a check and that Martinez needed until Thursday.  Mantanona said that was "good."  *Id.*, Page 74 of 102.  Shortly thereafter, Mantanona called "Greg" to thank him and said that he was going to give "Greg" something over the weekend.  *Id.*, Page 76 of 102.

### 3.    Need For the Continued Wiretap.

Ernst's affidavit discussed the need for the renewed or second wiretap, which included all of the reasons underlying the first one, plus "discovering the identities of jurors who have been influenced by MANTANONA . . . ."  *Id.*, Page 79 of 102.

---

[2] The court takes judicial notice that Dickson submitted a declaration to the court on November 13, 2018.  *See* Crim. No. 15-00031, Doc. 587 (sealed).  This declaration was mentioned in open court on the same day that allegations that Ms. Cruz had slept and had prematurely made up her mind were discussed.  *See* Transcript of Proceedings (Nov. 13, 2018), ECF No. 651, Pages 32-39 of 148.

25

According to Ernst, the first wiretap had uncovered Mantanona's attempts to influence the jury and showed Martinez's and Moser's knowledge of that conduct, as well as evidence that Mantanona had pressured Dickson to commit perjury. Thus, for the same reasons, Ernst said that the wiretap was necessary to discover any other juror who had been improperly influenced by Mantanona. *Id.*, Pages 80-81, 83-84, 87-88 of 102.

### D. November 28, 2018, Order.

On October 29, 2018, Judge Kobayashi signed the second order allowing the interception of communications to and from the Target Telephone used by Mantanona concerning the Target Offenses (distribution of methamphetamine, conspiracy to distribute methamphetamine, and influencing a juror) and the Target Subjects, who included Mantanona, Wolford, Martinez, Moser, and Tyquiengco, as requested by the November 28, 2018, wiretap application. *See* Misc. Case. No. 18-00439 LEK/RLP, ECF No. 6 (sealed).

## V. ANALYSIS.

### A. Martinez and Moser Are "Aggrieved Persons" Who May Seek Suppression of the Wiretaps.

Under 18 U.S.C. § 2518(10)(a), an "aggrieved person" may move to suppress the contents of an unlawfully intercepted communication or evidence derived therefrom. An "aggrieved person" is defined as "a person who was a party to any

intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11). The Government has conceded that Martinez and Moser are "aggrieved persons" who may seek suppression of the communications involving them that were intercepted pursuant to the wiretaps at issue here. *See* Doc. 131, Page 6 of 16.

### B. No Improper Piggybacking.

Defendants seek suppression of their communications intercepted pursuant to the wiretaps, arguing that the Government should have conducted a separate investigation into the jury tampering allegations instead of adding to the Mantanona investigation.

The wiretap application dated October 29, 2018, sought to intercept communications to and from the Target Telephone used by Mantanona. That application established probable cause that Wolford was distributing methamphetamine and paying Mantanona for protection from law enforcement. While Ernst detailed facts concerning Mantanona's jury tampering in other cases and expressed a belief that the wiretap would capture evidence of witness or jury tampering in the ongoing second Martinez/Moser trial, the application only sought and the judge only allowed the interception of wire communications to and from the Target Telephone used by Mantanona with respect to methamphetamine distribution and conspiracy to distribute methamphetamine.

Probable cause supported the Government's contention that the intercepted calls would pertain to methamphetamine distribution and conspiracy to distribute methamphetamine (including Mantanona's protection of drug dealers), the identities of other drug suppliers and co-conspirators, activities to obstruct law enforcement, the locations of drugs and proceeds and records, and the nature, scope, places, and methods of operation.

The court notes that the second Martinez/Moser trial involved allegations about a conspiracy to distribute methamphetamine and that Defendants were not in custody during that trial. While Defendants characterize the interception of calls between Mantanona and them concerning jury tampering as "piggybacking" on the probable cause with respect to drug crimes, 18 U.S.C. § 2517(5) specifically allows law enforcement to capture evidence of other crimes while conducting a wiretap:

> (5) When an investigative or law enforcement officer, while engaged in intercepting wire, oral, or electronic communications in the manner authorized herein, intercepts wire, oral, or electronic communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed or used as provided in subsections (1) [disclosure to other law enforcement] and (2) [using contents to the extent appropriate in performance of official duties] of this section. Such contents and any evidence derived therefrom may be used under subsection (3) [use while testifying] of this section when authorized or approved by a judge of competent jurisdiction where such

> judge finds on subsequent application that
> the contents were otherwise intercepted in
> accordance with the provisions of this
> chapter.  Such application shall be made as
> soon as practicable.

Thus, the Government may use intercepted communications concerning jury tampering even though the original wiretap of the phone Mantanona was using concerned methamphetamine violations. While Ernst believed such jury tampering communications would likely be intercepted, the wiretap evidence concerning Martinez and Moser was intercepted during the Government's monitoring of Mantanona's phone for drug and drug conspiracy crimes.  The wiretap was not on a phone used by Martinez or Moser.  The only reason the Government intercepted communications between Mantanona and Martizez or Moser was that the Government, pursuant to the first wiretap order, was monitoring the Target Telephone used by Mantanona.  At least with respect to such evidence, the Government cannot be said to have wrongfully "piggybacked" on anything.

Defendants cite *United States v. Carneiro*, 861 F.2d 1171 (9th Cir. 1988), asserting that that case held that "each alleged participant in a crime, for wiretap analysis purpose, must be investigated individually."  Doc. 128, Page 5 of 14. *Carneiro* involved multiple wiretaps.  With respect to one involving Ray Harty, the Ninth Circuit stated:

> The DEA failed to conduct an investigation of
> Harty prior to applying for authority to tap

> his telephone.  Instead, it appears that the
> DEA sought the wiretap simply because Harty
> was believed to be a member of the conspiracy
> under investigation.  A suspicion that a
> person is a member of a conspiracy, however,
> is not a sufficient reason to obtain a
> wiretap.

861 F.2d at 1181.  *Carneiro* stands for the proposition that every wiretap must be examined separately to determine whether the particular wiretap meets the wiretap requirements.

*Carneiro* does not say that the Government had to seek a separate wiretap of the phone of either Martinez or Moser to be entitled to gather evidence that Mantanona was communicating about or with Martinez or Moser.  The first wiretap sought evidence from and was authorized with respect to the Target Telephone used by Mantanona.  Unlike the first wiretap, the second one did target Martinez and Moser for their alleged involvement in jury tampering based on communications intercepted pursuant to the first wiretap order.  The second wiretap was still on the Target Telephone used by Mantanona.  The second wiretap just expanded the crimes targeted.

   **C.   The Judge Who Authorized the Wiretaps Did Not
         Abuse Her Discretion in Determining That the
         Wiretaps Were Necessary.**

In considering whether to suppress wiretap evidence pursuant to another district judge's order, a district judge reviewing a wiretap order applies a two-step approach.

First, the court determines *de novo* whether the information in an affiant's application for a wiretap satisfies § 2518(1)(c) by amounting to "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Defendants do not assert that the applications lacked a full and complete statement with respect to whether other investigative procedures had been tried and failed or whether procedures reasonably appeared unlikely to succeed or were too dangerous. The court has nevertheless conducted a *de novo* review and now determines that nothing in the record indicates that the Government failed to submit a full and complete statement with respect to both applications.

Second, when a wiretap application meets the first requirement, then the court reviews the record for abuse of discretion in the issuing judge's finding that the wiretap was necessary under § 2518(3)(c) and in her decision to grant the wiretap. *See United States v. Mureithi*, 2024 WL 208137, at *1 (9th Cir. Jan. 19, 2024); *Rodriguez*, 851 F.3d at 937. Defendants challenge the issuing judge's finding of necessity supporting the wiretaps here. The court rules that the issuing judge did not abuse her discretion in so finding. As set forth in Ernst's affidavit, normal investigative techniques were unlikely to result in evidence showing when and how methamphetamine was being

imported and stored and by whom, who else was paying Mantanona

for protection from law enforcement, and who was supplying

Mantanona with sensitive law enforcement information. Thus, the

issuing judge did not abuse her discretion in determining that

the first wiretap was necessary.

It was not necessary for the Government to have used

all possible investigative techniques before seeking the wiretap.

*See United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1113 (9th

Cir. 2005) (as amended) ("we are cognizant that the necessity

requirement should not be interpreted to require law enforcement

to exhaust every possible technique before resorting to

wiretapping, but to ensure that in the usual case wiretapping is

not used as the first meaningful step in an investigation.");

*United States v. Brone*, 792 F.2d 1504, 1506 (9th Cir. 1986)

("This necessity requirement means that the affidavit must set

out a factual background that shows that ordinary investigative

procedures, employed in good faith, would likely be ineffective

in the particular case. As a general rule, the wiretap should

not be the initial step in the investigation, but law enforcement

officials need not exhaust every conceivable alternative before

obtaining a wiretap." (citations omitted)); *United States v.*

*Brown*, 761 F.2d 1272, 1275 (9th Cir. 1985) ("the necessity

requirement is not intended to relegate the use of wiretaps to

that of last resort"). Defendants' argument that the Government

32

could have done more before resorting to the wiretap is unpersuasive.

Defendants argue that the first wiretap was unnecessary because the second jury trial was already ongoing. But the first wiretap did not specifically seek interception of communications regarding jury tampering. The wiretap application only noted that intercepted communications might include evidence of jury tampering. The focus of the first wiretap application and the first wiretap order concerned the need for a wiretap with respect to the alleged drug crimes.

The issuing judge similarly did not abuse her discretion in determining that the second wiretap was necessary. With respect to the alleged drug crimes, the same necessity supported the second wiretap as did the first. With respect to the alleged jury tampering, the wiretap was necessary because normal investigative techniques would not have uncovered who else on the jury in the second drug trial Mantanona might have attempted to tamper with. That evidence was only likely to come from Mantanona's conversations, for the same reasons that made the first wiretap necessary. Thus, for example, surveillance of Mantanona was not rendered easier because the Government was focusing on jury tampering, not only drug crimes.

**VI.      THE JUNE 20, 2022, NOTICE TO COURT OF ADDITIONAL REVIEW OF COMMUNICATIONS DID NOT TARGET EITHER MARTINEZ OR MOSER.**

On June 20, 2022, in the wiretap case filed in Hawaii, the Government filed a Notice to Court of Additional Review of Communications.  *See* Misc. No. 18-00439 LEK/RLP, ECF No. 15 (sealed).  This notice informed the court that the Government wanted to review the intercepted communications with respect to Mantanona and an individual other than Martinez or Moser.  The identity of this individual remains sealed.  Defendants argue that the proper procedure was to ask permission to reexamine the intercepted communication.  But, having failed to show that the reexamination prejudiced them in any way, Defendants are unpersuasive in arguing that the properly intercepted wiretap evidence against them should be suppressed because the Government reexamined that evidence to look for evidence of crimes involving Mantanona and someone other than Martinez or Moser.  In other words, Martinez and Moser are not "aggrieved persons" with respect to the communications between Mantanona and an unidentified individual.  *See* 18 U.S.C. § 2510(11).  Under 18 U.S.C. § 2518(10)(a), they lack standing to seek suppression of the contents of the communications between Mantanona and that unidentified individual.

**VII.      CONCLUSION.**

   The motion to suppress and the accompanying joinder, as well as the motion for an evidentiary hearing, are denied.



   It is so ordered.

   DATED: Honolulu, Hawaii, June 11, 2024.



          /s/ Susan Oki Mollway
          Susan Oki Mollway
          United States District Judge


*United States of America v. Martinez, Jr., et al.*, CRIMINAL CASE NO. 22-00019; ORDER DENYING MOTION TO SUPPRESS FILED BY DEFENDANT RAYMOND JOHN MARTINEZ, JR., AND DEFENDANT JUANITA MARIE QUITUGUA MOSER MARTINEZ'S ACCOMPANYING JOINDER; ORDER DENYING REQUEST FOR EVIDENTIARY HEARING